[No. A027699. First Dist., Div. One. May 29, 1986.]

PATRICIA ROSBURG, Plaintiff and Appellant, v.
MINNESOTA MINING & MANUFACTURING CO. et al.,
Defendants and Respondents.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of parts III and IV.

**COUNSEL**

Thomas E. Kotoske for Plaintiff and Appellant.

Paul H. Cyril, Charles F. Preuss, Kevin G. McKurdy and Bronson, Bronson & McKinnon for Defendants and Respondents.

## Opinion

**NEWSOM, J.**—Before us on this appeal is a products liability case involving a breast prosthesis which deflated six years after it was implanted. The factual background may be summarized as follows.

In April of 1976, plaintiff consulted Dr. Roland Minami, a plastic surgeon, about surgery to augment the size of her breasts. Dr. Minami told her he would use silicon implants which were filled with saline in the augmentation surgery. The implants were manufactured by McGhan Medical Corporation, a subsidiary of defendant Minnesota Mining & Manufacturing Co. (hereafter 3 M). On May 27, 1976, Dr. Minami performed surgery and inserted two McGhan style 90 inflatable breast implants in plaintiff. The left side was filled with 200 cc's of saline and the right side with 235 cc's of saline to achieve symmetry.

In May of 1982, the right implant spontaneously deflated. Plaintiff consulted with Dr. Courtland Harlow, another plastic surgeon, who recommended that the implant be replaced. On May 13, 1982, Dr. Harlow removed the original implant. At this time he could see that it was folded upon itself and collapsed. The implant was shown to plaintiff who observed that it was flat, contained no fluid and had several folds in it. Approximately 75 cc's of saline had leaked into plaintiff's chest. At the completion of this surgery, Dr. Harlow noted the possibility that the left implant had a slow leak.[1] The right implant was lost sometime during its transmission from the hospital to McGhan and was unavailable for testing.

In November of 1982, plaintiff filed a complaint for damages based upon negligence and strict products liability against 3 M and its predecessor corporations.[2] In June of 1983, plaintiff noticed that her left breast had grown smaller. She again consulted Dr. Harlow, who noted some asymmetry and recommended surgery. In September of 1983, the left implant was

---

[1]This observation was based on the fact that only 215 cc's of saline in the right implant achieved symmetry where originally 235 cc's were necessary.

[2]The McGhan style 90 was developed by McGhan Medical Corporation, a California corporation. In 1977, that company was purchased by 3 M. The form of the acquisition involved the exchange of 3 M stock for McGhan stock. A wholly owned subsidiary of 3 M, also named McGhan Medical Corporation (a Delaware corporation), acquired the assets of McGhan (California), and continued to operate the business. McGhan (California) was dissolved.

replaced. After removing the McGhan implant, Dr. Harlow was unable to detect a leak in the implant, even when he applied pressure. The subsequent pathology report indicated that 30.5 cc's of saline were missing from the implant. Dr. Harlow, however, could not confirm the existence of a leak at the time of removal.

At trial, both parties waived a jury. Plaintiff's theory as to the cause of failure of the implant was sensitivity of the implant material to creasing which caused subsequent leaks. Plaintiff's expert testified that the left implant had a crease across the top and a pinhole leak on the bottom side. A microscopic examination disclosed the existence of a small crack on the bottom of the implant. The area around the crack was substantially thicker than had been called for by the manufacturer's specifications. Plaintiff's expert deduced that the fold on top of the implant created a greater stress on the underside due to the increased thickness and that this caused the crack and resulting leak. He also gave his opinion that the manufacturer's specifications allowed underfilling of the implant, which, in turn, made folding more likely.[3]

Defendant's expert testified to many other possible causes for deflation of the implant. These included diffusion of fluid through the shell of the implant, error on the part of the surgeon as to the amount of saline introduced into the implant, and accidental puncture of the implant with a scalpel or suture. He did not believe that the thickness of the implant shell was related to the failure. In his opinion, the hole in the left implant was caused by a sharp object puncturing it after it was removed from plaintiff. Other witnesses for defendants testified that creasing of the implant was not known as a possible cause of failure in 1976. Plaintiff's own expert testified that the creasing alone did not cause the implant to fail.

On April 16, 1984, the trial court filed a memorandum decision determining that any puncture of the left implant occurred after surgery, that the right implant did not have a manufacturing defect or a design defect, that the manufacturing process was safe and that the warnings were adequate. The court also concluded that the benefits of augmentation surgery are slight, but that the risks are even less, and that an ordinary consumer should expect the possibility of deflation.

Judgment was entered on May 21, 1984, and plaintiff appeals.

I. *The Evidence Regarding the Existence of a Defect*

Plaintiff claims that the evidence established that the product was defective as a matter of law. This argument focuses on the evidence favorable to

---

[3]The folding was caused by normal compression of the pocket, or capsule, in the breast.

plaintiff and ignores the evidence which supports the verdict. ■ Of course, a reviewing court must view the evidence from precisely the opposite perspective, considering *only* that evidence supportive of the judgment below. (*Chodos* v. *Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 97 [178 Cal.Rptr. 831].) So doing, we find that substantial evidence supports the trial court's determination that there was no defect in the McGhan implants.

■ Our analysis begins with the proposition that: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) A product may contain manufacturing or design defects. (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 429 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) A manufacturing defect exists when the product differs from the intended result. (*Id.*) A design defect is determined by the application of two alternative tests: "(1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if the plaintiff proves that the product's design proximately caused his injury and the defendant fails to prove, in light of the relevant factors discussed above, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Id.*, at p. 435.)

■ In addition, a product which is not otherwise defective may be rendered defective if a suitable warning as to the product's dangerous propensity is not given. (*Cavers* v. *Cushman Motor Sales, Inc.* (1979) 95 Cal.App.3d 338, 344-345 [157 Cal.Rptr. 142].)

A. *The Design Defect: The Consumer Expectation Test*

■ Plaintiff points to her own testimony to the effect that she did not know of the possibility of deflation and expected the implants to last for her lifetime. She argues that the judgment must be reversed because—she contends—her testimony is the only evidence on this issue. We cannot agree that there was no other evidence supportive of the judgment on this issue.

■ When the product at issue is within the scope of common experience, the consumer expectation test may be applied without benefit of expert testimony. (*Akers* v. *Kelley Company, Inc.* (1985) 173 Cal.App.3d 633,

649-651 [219 Cal.Rptr. 513].)[4] Mammary implants are not the type of commonly available products that the ordinary consumer encounters in common experience. (See, e.g., *Lunghi* v. *Clark Equipment Co.* (1984) 153 Cal.App.3d 485, 496 [200 Cal.Rptr. 387].) Sale of implants is restricted to licensed physicians. There was expert testimony regarding the ordinary expectations of product performance. The physician who inserted plaintiff's implants in 1976 testified that at that time he knew of the risk of deflation and warned his patients accordingly. He did not expect the implants to last a lifetime and did not tell plaintiff that they would. Defendants' expert testified that he knew some implants would deflate and that those patients would need a second surgery. As the subject of mammary implants is outside the realm of common experience, the expert testimony was relevant and admissible. Thus, evidence supports the trial court's finding that the implants were not expected to last a lifetime and that an ordinary consumer should expect a possibility of eventual deflation.

 The testimony of a single witness is sufficient to support the judgment. (*Chodos* v. *Insurance Co. of North America, supra,* 126 Cal.App.3d 86, 97.) The consumer expectation test disclosed no defect and the trial court's finding to this effect is supported by substantial evidence.

---

[4]The Sixth District in *Akers* discusses two decisions of this district which pertain to the use of expert testimony in the consumer expectation test and finds them in error. (Accord, *West* v. *Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831, 866 [220 Cal.Rptr. 437].) In *Lunghi* v. *Clark Equipment Co.* (1984) 153 Cal.App.3d 485 [200 Cal.Rptr. 387], Division Three of this district determined that the use of a front-end loader was not a matter within the common knowledge of the ordinary person. (*Id.,* at p. 496.) It followed from that determination that it was not error to refuse to instruct the jury on the consumer expectation test in the absence of expert testimony. In *Bates* v. *John Deere Co.* (1983) 148 Cal.App.3d 40 [195 Cal.Rptr. 637], Division Two of this district expressly did not reach the issue, but noted that it was difficult to apply the consumer expectation test to determine the ordinary expectations of performance of a commercial cotton-picking machine. (*Id.,* at p. 52.) The *Akers* court interprets these two cases as refusing to apply the consumer expectation test when the product is not within the common experience. We disagree, and read the two cases as mere applications of the established rule regarding when expert testimony is necessary. (*Lunghi* v. *Clark Equipment Co., supra,* 153 Cal.App.3d at p. 496.) *West, supra,* involved a menstrual tampon, which was within the realm of common experience. *Akers,* however, involved a bizarre accident in which a complex piece of machinery catapulted apart, sending pieces flying a distance of 10 to 15 feet. Regardless of the complexity of the machinery involved, a jury could have concluded that no one would expect this result. Although *Lunghi* and *Bates, supra,* also involved complex machinery, neither dealt with a bizarre accident. *Lunghi* involved a front-end loader which was left with the motor off and the bucket raised. *Bates* involved a plaintiff who attempted to kick a rock out of a cotton-picking machine without shutting the motor off. Expert testimony was required in those cases because the ordinary juror would not know how these pieces of equipment would be expected to perform under the circumstances. *Lunghi* and *Bates,* presumably, would apply the consumer expectation test if expert testimony as to what a consumer could expect of the equipment was involved in those cases.

## B. *The Design Defect: The Risk-Benefit Test*

The trial court expressly found that the benefits of the McGhan style 90 outweighed the risk of injury due to deflation. ■ This alternative prong of the *Barker* test for a design defect applies in the situation where the product satisfies ordinary consumer expectations, but it can be determined through hindsight that the design embodies risks that could have been prevented. (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, 430.) Once plaintiff proves that a defect caused the injury, defendant bears the burden of proof of showing that the benefits of the product design outweighed the risks. (*Id.,* at pp. 431-432.)

■ Plaintiff contends that overwhelming evidence demonstrated defendant did not establish that the benefits outweighed the risks. ■ We note again that the only appropriate inquiry on appeal is not whether the burden of proof was met but whether substantial evidence supports the decision. ■ Here, defendant produced a great deal of evidence that there was no better material available for this purpose, that there were no more appropriate testing measures available than these used by McGhan, that the saline-filled implant was less dangerous than gel-filled implants in the event of leakage—as saline was not harmful—and that the inflatable implant was more pleasing cosmetically. Defendant's expert testified that, in his opinion, the design benefits outweighed the risks in 1976. Thus, even if plaintiff had established that a design defect caused her injury, there is substantial evidence to support the trial court's finding regarding the risk-benefit analysis.

## C. *The "Failure to Warn" Defect*

■ Failure to warn of the dangerous propensity of a product may render the product defective. (*Cavers* v. *Cushman Motor Sales, Inc., supra,* 95 Cal.App.3d 338, 343.) ■ Plaintiff argues that McGhan has a continuing duty to warn *physicians* of problems associated with the use of its products, based upon *Perfetti* v. *McGhan Medical* (1983) 99 N.M. 645 [662 P.2d 646], cert. den., 99 N.M. 644 [662 P.2d 645]. She contends that defendants failed to warn doctors after 1976 of the increasing incidence of spontaneous deflations (e.g., not caused by exterior trauma).

We note initially that the New Mexico court in *Perfetti, supra,* did not discuss the existence of a continuing duty to warn, but merely found a jury question as to the adequacy of the warning at issue. (*Id.,* at pp. 650-651.) Plaintiff does not explain how a warning in 1978 or 1979 would have prevented an injury to her when the implant had already been placed in her body in 1976. It would have been too late for the physician to decide not

to use the product and no post-implant method of averting deflation is suggested. There is no requirement that a manufacturer must give a warning which could not possibly be effective in lessening the plaintiff's risk of harm. (*Kearl* v. *Lederle Laboratories* (1985) 172 Cal.App.3d 812, 832-836 [218 Cal.Rptr. 453]; *Christofferson* v. *Kaiser Foundation Hospitals* (1971) 15 Cal.App.3d 75, 79-80 [92 Cal.Rptr. 825, 53 A.L.R.3d 292].)

It appears, therefore, that plaintiff is actually challenging the sufficiency of the warning rather than a failure to warn after the fact. McGhan's package insert contained the following statement: "McGhan Medical Corporation is aware of the potential for leakage in inflatable implants over an undefined time period. Considering the chemical and physical properties of the material used in the manufacture of the inflatable implants, deflation is not expected. However, long-term results cannot be guaranteed by the manufacturer." Substantial evidence exists to support the conclusion that this warning represented the state of available knowledge in 1976.

We note the existence of an additional problem concerning plaintiff's complaints about the adequacy of the warning: plaintiff's physician already knew of the danger of spontaneous deflations. Accepting this, we perceive that no harm could have been caused by failure to warn of a risk already known. (See, e.g., *Perfetti* v. *McGhan Medical, supra,* 662 P.2d at p. 651 [discussing the surgeon's prior knowledge and concluding that it is a fact question].)[5] We conclude that there is substantial evidence that the warning was sufficient in light of the available facts in 1976.

## II. *Evidence Regarding State of the Art*

■ Plaintiff next argues that the trial court erroneously applied the "state of the art" defense, which is properly a defense to negligence and not strict products liability. The court's memorandum opinion stated that the style 90 was "state of the art in 1976." After reviewing the decision, we conclude that the trial court was merely indicating the unavailability of any superior design options in 1976 under the risk-benefit analysis of *Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413. Unlike evidence of industry custom which is improperly offered to negate the existence of a defect, evidence that a product is designed in accordance with the existing state of the art is relevant in a risk-benefit analysis. (*McLaughlin* v. *Sikorsky Aircraft* (1983) 148 Cal.App.3d 203, 210 [195 Cal.Rptr. 764].)

---

[5]The *Perfetti* court, *supra,* indicated that a surgeon's general knowledge regarding the danger of deflation would not negate the need for a specific warning of the risk of deflations due to leaking caused by wear of the implant at a fold. Plaintiff in this case failed to establish that any specific defect caused the deflation; thus, she cannot urge that a more specific warning could have prevented her injury.

III.-IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Racanelli, P. J., and Elkington, J., concurred.

---

*See footnote, *ante,* page 726.