[No. A062962. First Dist., Div. Two. Apr. 11, 1995.]

PAMELA MORTON, Individually and as Special Administrator, etc., Plaintiff and Respondent, v. OWENS-CORNING FIBERGLAS CORPORATION, Defendant and Appellant.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III(A), III(B), III(D), and III(E).

COUNSEL

Wright, Robinson, McCammon, Osthimer & Tatum, James C. Nielsen and Thomas H. Nienow for Defendant and Appellant.

Kazan, McClain, Edises & Simon, Aaron Simon and Bryce C. Anderson for Plaintiff and Respondent.

OPINION

**HAERLE, J.—**

### I. INTRODUCTION

Robert and Pamela Morton brought this strict products liability action against Owens-Corning Fiberglas Corporation (OCF) and others for damages arising from Mr. Morton's exposure to asbestos containing products and his consequent development of mesothelioma, an asbestos-caused form of cancer. Although Mr. Morton died before the trial was complete, OCF was ultimately found liable to plaintiffs. Judgment was entered against OCF for $3,002,356 in favor of Mrs. Morton as administrator of her husband's estate and $148,314 in favor of Mrs. Morton individually.[1] OCF urges reversal of the judgment for several reasons. We find that modification of the damage awards is necessary but that OCF is not entitled to reversal of the judgment against it.

### II. FACTS AND PROCEDURAL BACKGROUND

From December 1959 to February 1961, Mr. Morton worked at the New York Shipbuilding Yard in Camden, New Jersey (the Shipyard). He worked

---

[1] We use the term "plaintiffs" to refer to Mrs. Morton in her dual capacity as well as to refer to Mr. and Mrs. Morton as coplaintiffs prior to Mr. Morton's death.

as a wireman, installing cable on board ships. The majority of his time at the Shipyard was spent working on a ship called the Kitty Hawk. After working in the Shipyard, Mr. Morton joined the Air Force where he worked as an illustrator. He then worked as a salesman while he earned his engineering degree. Thereafter, Mr. Morton worked as a structural engineer. Mr. Morton was in good health until October 1991, when he developed flu symptoms and chest pains. During the following months, Mr. Morton underwent various tests and, in May 1992, was diagnosed with mesothelioma.

The trial court ordered that the trial be bifurcated. The damages phase was tried first, to the judge, who made separate findings for each type of damages plaintiffs' suffered.[2] The liability phase was tried to a jury who heard Mr. Morton's testimony by videotape deposition. On February 26, 1993, Mr. Morton died prior to completion of the trial. Over OCF's objection, the court elected to proceed to judgment. Mrs. Morton filed a declaration under section 377.32 of the Code of Civil Procedure requesting that she be allowed to continue the action as Mr. Morton's survivor. Thereafter, the jury found OCF liable to plaintiffs and responsible for 12 percent of their damages.

## III. DISCUSSION

A., B.*

.  .  .  ..  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## C. *Proof of a Design Defect*

■ "A manufacturer, distributor, or retailer is liable in tort if a defect in the manufacture or design of its product causes injury while the product is being used in a reasonably foreseeable way." (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 560 [34 Cal.Rptr.2d 607, 882 P.2d 298], citing *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 126-130 [104 Cal.Rptr. 433, 501 P.2d 1153].) ■ OCF objects to the method by which plaintiffs proved

[2]Originally, phase I was to address medical causation and compensatory damages. However, the parties stipulated prior to trial that Mr. Morton's mesothelioma was caused by asbestos exposure.

The court found Mr. Morton was entitled to $37,000 for past medical expenses, $63,000 for future medical expenses, $43,703 for past lost wages, $1,090,467 for future loss of earning capacity, and $2 million for noneconomic damages. Mrs. Morton was entitled to $250,000 for the loss of her husband's consortium. OCF received credit from prior settlements actually received by plaintiffs thus reducing the judgment to $3,002,356 for Mr. Morton's claims and $148,314 for Mrs. Morton's claim.

*See footnote, *ante*, page 1529.

OCF's product was defective, i.e., the "consumer expectations" test. OCF contends the trial court should have granted its motion for nonsuit because the consumer expectations test does not apply to this case as a matter of law. Alternatively, OCF argues that, if the consumer expectations theory did apply, the court erred by excluding "state of the art" evidence offered to disprove plaintiffs' theory.

### 1. *Applicability of the consumer expectations test*

·"[T]he term defect as utilized in the strict liability context is neither self-defining nor susceptible to a single definition applicable in all contexts." (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 427 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) Our Supreme Court has identified two alternative criteria for ascertaining whether a product has a design defect.[7]

First, the consumer expectations test provides that ". . . a product may be found defective in design if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." (*Barker* v. *Lull Engineering Co.*, *supra*, 20 Cal.3d at p. 429.) This test derives from the warranty heritage upon which our product liability doctrine partially rests and recognizes that " 'implicit [in a product's] presence on the market . . . [is] a representation that it [will] safely do the job for which it was built.' " (*Id.* at p. 430.)

The second "risk-benefit" test evolved in response to situations in which the consumer would not know what to expect because, for example, he would have no idea how safe the product could be made. (*Barker* v. *Lull Engineering Co.*, *supra*, 20 Cal.3d at p. 430.) Under this test, ". . . a product may be found defective in design, even if it satisfies ordinary consumer expectations, if through hindsight the jury determines that the product's design embodies 'excessive preventable danger,' or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design. [Citations.]" (*Ibid.*)

Our Supreme Court recently clarified that the consumer expectations test is not suitable in all design defect cases because "in many instances it is simply impossible to eliminate the balancing or weighing of competing

---

[7]A third, distinct, theory which is often invoked in cases such as this is that a manufacturer can be held strictly liable for failing to warn or for giving inadequate warnings about its products. (See generally, *Anderson* v. *Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987 [281 Cal.Rptr. 528, 810 P.2d 549].) Plaintiffs in the present case did not argue such a theory to the jury.

considerations in determining whether a product is defectively designed or not." (*Soule* v. *General Motors Corp.*, *supra*, 8 Cal.4th at pp. 562-563.) OCF contends that *Soule* establishes that the consumer expectations test does not apply to strict liability actions involving asbestos products. However, we recently rejected this precise contention in *Sparks* v. *Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 472-476 [38 Cal.Rptr.2d 739] (hereafter *Sparks*).

In *Sparks*, this court affirmed a judgment against Owens-Illinois in a case in which plaintiffs established that Owens-Illinois's asbestos-containing insulation product was defective under the consumer expectations test. (*Sparks*, *supra*, 32 Cal.App.4th 461.) Our analysis included a thorough discussion of the limited scope of the consumer expectations test as set forth by the Supreme Court in *Soule* v. *General Motors Corp.*, *supra*, 8 Cal.4th 548. We applied the *Soule* analysis to the asbestos context, focusing on the " 'crucial question' " as to " 'whether the circumstances of the product's failure permit an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers.' " (*Sparks*, *supra*, 32 Cal.App.4th at p. 474, quoting *Soule* v. *General Motors Corp.*, *supra*, 8 Cal.4th at pp. 568-569.) Ultimately, we concluded that *Soule* did not preclude plaintiffs from relying on a consumer expectations theory because, among other things, "[t]here were neither 'complicated design considerations,' nor 'obscure components,' nor 'esoteric circumstances' surrounding the 'accident' " and because the product failure was "beyond the 'legitimate, commonly accepted minimum safety assumptions of its ordinary consumers.' " (32 Cal.App.4th at pp. 474-475, quoting *Soule* v. *General Motors Corp.*, *supra*, 8 Cal.4th at pp. 569-570.)

*Sparks* is consistent with our Supreme Court's recent pronouncements in *Soule* and is dispositive here. As in *Sparks*, the situation in the present case is one in which the everyday experiences of the consumers of OCF's product would permit a conclusion that the product's design violated minimum safety assumptions. The injury Mr. Morton incurred was not the result of esoteric circumstances or an alleged mechanical malfunction. OCF's product was not itself a complex or technical device. Further, the individuals who worked with and around this product were capable of formulating minimum expectations as to its safety. Thus, as we did in *Sparks*, we reject the contention that the consumer expectations theory does not apply to this case as a matter of law.

Further, we find sufficient evidence in the record to satisfy the consumer expectations test in the present case. Plaintiffs presented several

percipient witnesses, including Mr. Morton, who testified they believed the insulation products used on the Kitty Hawk were safe and that they had no expectation that exposure to such products would make them ill.[8] OCF presented no evidence that consumers of its product knew, expected, or even suspected that product was unsafe.

### 2. State-of-the-art evidence

■ OCF contends the trial court erred by precluding it from offering "state of the art" evidence which it defines as "evidence that a particular risk was neither known nor knowable by the application of scientific knowledge available at the time of manufacture and/or distribution." OCF's theory of relevance was "that Mr. Morton would not have an expectation of the product that it could be safer than the medical and scientific knowledge at the time indicated it was." The trial court ruled OCF's state-of-the-art evidence was not relevant under the consumer expectations test.

We agree with the trial court that evidence as to what the scientific community knew about the dangers of asbestos and when they knew it is not relevant to show what the ordinary consumer of OCF's product reasonably expected in terms of safety at the time of Mr. Morton's exposure. It is the knowledge and reasonable expectations of the consumer, not the scientific community, that is relevant under the consumer expectations test. The fact that the scientific community was unaware of the dangers of asbestos, if that is a fact, would not make it any less reasonable for Mr. Morton or other consumers of OCF's products to expect that they could work with or near OCF's products without getting cancer.

OCF contends that excluding state-of-the-art evidence makes it the insurer of its product's safety and is thus inconsistent with *Anderson* v. *Owens-Corning Fiberglas Corp., supra,* 53 Cal.3d 987. The *Anderson* court held that state-of-the-art evidence is admissible when the theory of strict liability is the manufacturer's or distributor's failure to warn of a risk of harm. In that

---

[8]Mr. Morton testified there were no warnings about the dangers of asbestos dust, and nobody used masks. He believed the materials being used at the yard were safe, and did not know about the hazardous nature of asbestos dust until the early 1980's.

William Kimley worked as an electrician's assistant on the Kitty Hawk, and knew Mr. Morton. Kimley specifically remembered that OCF asbestos insulation was used on the Kitty Hawk. Kimley testified he believed the asbestos insulation used on the Kitty Hawk was safe and never expected that asbestos dust would cause cancer or other diseases.

John Murphy also worked at the Shipyard during the time Mr. Morton was there. He specifically recalled that OCF "Kaylo" insulation was used on the Kitty Hawk. Murphy testified that, at the time he worked in the Shipyard, he did not expect that dust from the insulation materials was harmful.

context the knowledge of the party responsible for giving the warning is obviously relevant. (*Id.* at pp. 990-992.) But the *Anderson* court expressly declined to extend its holding to cases based on the consumer expectations test. (*Id.* at p. 992, fn. 2.)[9]

OCF also contends that *Barker* v. *Lull Engineering, supra,* 20 Cal.3d at pages 433-434 compels us to hold that state-of-the-art evidence is admissible. However, the passages OCF quotes from *Barker* expressly refer to the risk-benefit test, not to the consumer expectations test. Elsewhere in the *Barker* opinion, the court explicitly approved the consumer expectations test which focuses exclusively on the expectations of the consumer: "When a product fails to satisfy such ordinary consumer expectations as to safety in its intended or reasonably foreseeable operation, a manufacturer is strictly liable for resulting injuries." (*Id.* at p. 430.)

Finally, OCF contends that courts have admitted, in consumer expectations cases, expert evidence designed to educate the jury about the nature of the allegedly defective product. (See *Lunghi* v. *Clark Equipment Co.* (1984) 153 Cal.App.3d 485, 496 [200 Cal.Rptr. 387]; *Rosburg* v. *Minnesota Mining & Mfg. Co.* (1986) 181 Cal.App.3d 726, 732-733 [226 Cal.Rptr. 299].)[10] Under certain circumstances, expert testimony may be admissible to prove what ordinary consumers of the product actually expect when those expectations are beyond the lay experience common to all jurors. (*Soule* v. *General Motors Corp., supra,* 8 Cal.4th at pp. 567-568, fn. 4.) Our point is that evidence as to the knowledge of the scientific community is nevertheless irrelevant to prove the reasonable expectations of the consumers of OCF's product. OCF's authority does not hold to the contrary.

For example, in *Rosburg* v. *Minnesota Mining & Mfg. Co.,* the trial court found that mammary implants "were not expected to last a lifetime and that an ordinary consumer should expect a possibility of eventual deflation." (*Rosburg* v. *Minnesota Mining & Mfg. Co., supra,* 181 Cal.App.3d at p. 733.) The expert testimony that supported this finding was not state-of-the-art evidence, but testimony by doctors who used the product about their expectations, and by the plaintiff's doctor in particular who testified that he knew

[9]*Anderson* adopted the reasoning of Division Five of this court as set forth in *Vermeulen* v. *Superior Court* (1988) 204 Cal.App.3d 1192 [251 Cal.Rptr. 805], that state-of-the-art evidence is admissible in failure to warn cases. (*Anderson* v. *Owens-Corning Fiberglass, Corp., supra,* 53 Cal.3d at p. 991.) The *Vermeulen* court also declined to disturb a trial court ruling that state-of-the-art evidence was not relevant under the consumer expectations test. (*Vermeulen* v. *Superior Court, supra,* 204 Cal.App.3d at pp. 1198-1199.)

[10]Some of the authority OCF cites for this proposition does not address the consumer expectations test at all. (See *Garcia* v. *Joseph Vince Co.* (1978) 84 Cal.App.3d 868 [148 Cal.Rptr. 843]; *Buccery* v. *General Motors Corp.* (1976) 60 Cal.App.3d 533 [132 Cal.Rptr. 605].)

of the risk of deflation and advised his patients accordingly. (*Ibid.*) By contrast to *Rosburg*, in the present case OCF's proffered evidence did not establish that members of the scientific community used its product or even that their knowledge or absence of knowledge about the dangers of asbestos was communicated to the ordinary consumers of OCF's product. Their evidence was, therefore, irrelevant.

D., E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The judgment below is modified in the following respects. First, with respect to Mr. Morton's causes of action, the damages awards of $2 million for noneconomic damages, $63,000 for future medical expenses and $1,090,467 for future loss of earning capacity are stricken. Thus the total award under Mr. Morton's causes of action is $80,703.

Second, the damages awarded to Mrs. Morton for loss of consortium are modified as provided in the trial court's advisory ruling such that OCF is responsible for 12 percent of the total damages on this claim, i.e., $30,000.

In all other respects, the judgment below is affirmed.

Smith, Acting P. J., and Phelan, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 29, 1995. Kennard, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 1529.