Filed 7/14/15  Golston v. Hertz Equipment Rental CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TAWANA GOLSTON et al., | D067431 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. CIVVS907786) |
| HERTZ EQUIPMENT RENTAL CORPORATION, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Joseph R Brisco, Judge.  Reversed.

Law Offices of Martin N. Buchanan, Martin N. Buchanan; Giradi Keese and David R. Lira for Plaintiffs and Appellants.

Lombardi, Loper & Conant, John W. Ranucci and Maria M. Lampasona for Defendant and Respondent.

INTRODUCTION

This is a product liability case in which plaintiffs Tawana Golston, Jamichael Weathers and Jacari Golston (collectively, plaintiffs) contend Hertz Equipment Rental Corporation (Hertz) provided a defectively designed water truck without adequate warnings to the employer of their husband and father, Marty Golston (Golston), and the truck caused Golston's death while he transported water for his employer on a highway from one job site to another job site. When Golston made a left turn, the water in the truck's tank sloshed to the right, the center of mass shifted, and the truck rolled 360 degrees. The roof of the truck's cab crushed during the roll and Golston suffered head and neck injuries, which resulted in his death. Appealing the judgment on a jury verdict, the plaintiffs contend: (1) the trial court erred in failing to instruct the jury regarding the consumer expectation theory of the design defect claim, (2) the trial court erred in instructing the jury regarding the sophisticated user defense to the failure to warn claim, and (3) the trial court erred in striking the testimony of their expert who testified regarding his testing of a nearly identical exemplar vehicle and his opinion the water truck with the water tank added by Hertz was defective because it failed to meet industry performance standards. We agree with each of these contentions and reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Hertz Production and Rental of Water Trucks*

At the request of Hertz, Valew Welding and Fabrication (Valew) fabricated water tanks and mounted them on chassis provided by Hertz. Over the years, Valew fabricated

2

about 750 water tanks for Hertz.  For the vehicle at issue in this case, Hertz ordered a 2,000 gallon tank system to be installed on a cab and chassis provided by Hertz.  Hertz requested one crosswise baffle to be welded into the middle of the tank with a manway opening, similar to an exemplar vehicle it asked Valew to inspect.  A crosswise baffle slows the movement of water from front to back and mitigates the force when braking.

Hertz rents water tank trucks to construction sites or construction companies.  When Valew delivered the water tank trucks to Hertz, it included an operation manual regarding the water tank in the cab of each truck intended for use by those who rented the truck.  The manual stated, " 'Never transport water on highways.' "  However, Hertz allows its customers to operate 2,000-gallon water trucks on highways.  Hertz did not use the tank manual prepared by Valew or provide it to its customers.  The manager at the Santa Maria Hertz branch who rented equipment testified he had never seen the operation manual for the water truck.

*Recon's Rental and use of Water Trucks*

Golston's employer, Remedial Construction Services, L.P. (Recon), uses water trucks for dust control and compaction.  It uses various sizes of trucks from some that hold 2,000-gallons of water to others holding 8,000- to 13,000-gallons.

Recon rented water trucks from Hertz.  No one at Hertz advised Recon to "never transport water on highways" and there was evidence Recon employees never saw an operation manual for the water tank in a water truck rented from Hertz.   Many times they had to get water from somewhere off of the job site.

3

Recon provides its employees with some driving school training, training for working with hazardous materials and job site-specific training. It also provides on-the-job training for certain vehicles. Operating a water truck is something one can do when one starts to drive.

*Golston's Work with Recon*

Golston started working for Recon in Texas to earn more money and make a better life for his family. He started by digging trenches, working on the ground, building fences on construction sites and eventually driving water trucks. He was frequently called to work in California for six to eight months at a time.

Golston was known as a "laborator," which is a combination of a laborer and a low-level operator. This is a laborer who has shown incentive and ability to safely operate water trucks or other non-heavy equipment. Laborators were allowed to operate certain equipment that do not take a lot of extra training to learn to operate safely.

Golston operated water trucks for a couple of years before the accident. The service project manager, Danny Watts, never saw Golston operate a water truck in an improper or unsafe manner. However, he never observed Golston operate a water truck on a highway. Golston did not have specialized training and testing in the operation of water tank trucks.

*The Accident*

On the morning of June 24, 2008, Golston was initially working at a job site in Santa Maria known as Wiley, but was selected to drive the water truck for another project at the Battles Gas Plant (Battles) job site where they were building a temporary parking

4

lot. Golston's superiors at Recon considered him to be experienced, thoughtful, and a slow and safe driver.

Stanley Bailey, the superintendent of the Battles site, picked up Golston from the Wiley site and drove approximately five miles to the Battles site. Since there was no source of water at the Battles site, they planned to obtain water from the Wiley site. They drove the route to establish a journey management plan to make sure Golston knew which way to turn and to identify hazards. Bailey pointed out the unprotected left turn from Betteravia Road on to Rosemary Road and advised Golston to be careful about the traffic in the area.

Lance Reed, another superintendent with Recon, testified Golston told him on the morning of the incident he did not want to work with equipment that day and preferred to work with a shovel. He mentioned his diabetes. However, Golston ended up operating the water truck that day. No one issued a stop work authority due to any concerns about Golston's ability to operate the truck.[1]

Golston drove to the Wiley site, obtained water, and returned to the Battles site at least once without incident. He was seen spraying water where the gravel was to be laid.

---

[1] Recon has a "stop work" program in which any employee could tell a supervisor he or she did not feel safe doing a particular job and could unilaterally stop work. This applies to anything that would make an employee unsafe, which could include illness or lack of communication or understanding about an assigned task. If any employee sees something that appears unsafe, including assignment of another employee to a particular task, the employee can invoke a stop work.

On one trip to the Wiley site, another employee who was a lead equipment operator, helped Golston fill the water tank. While the tank was filling, Golston mentioned he was unhappy and did not want to be at work or to operate equipment that day. He said he would prefer to be on the ground doing labor work. When the other employee suggested Golston speak to a superintendent, Golston said he had done so and he was told he had to drive the water truck. They did not allow him to go home. Golston said he missed his family in Texas and he wanted to sweat that day by doing physical labor. The employee understood Golston had been away from his family for quite a while and wanted to be home with them. The employee helped Golston fill the water tank three-quarters full to avoid being overweight.

On what would be his final trip back to the Battles site, Golston slowly entered Betteravia Road and increased his speed along with other traffic as he traveled eastbound on Betteravia. When Golston approached Rosemary Road, he turned on the left turn signal. As he made the left turn, he cut the corner, meaning the vehicle moved into the southbound lane of Rosemary Road and crossed the stop line. Water came out of the top of the tank, the truck skidded, rolled, and came to rest in a drainage ditch.

Witnesses estimated Golston was traveling between 30 and 35 miles per hour as he began the turn. While one witness said Golston did not slow down as he made the turn, another witness testified he did slow down before he turned.

When a paramedic arrived, Golston was communicative, but he was pinned in the truck's cab. He reported he felt the water shift as he made the left turn onto Rosemary Road from Betteravia Road and he lost control of the vehicle. Golston said he was

6

traveling about 35 miles per hour.  The paramedic suspected a severe spinal cord injury because Golston had no sensation or movement in his body below the nipple line.

Golston suffered a head injury and a crushed vertebra in his neck.  He was paralyzed from the shock to the spinal cord.  He underwent surgery for removal of the crushed vertebra and fusion with a titanium cage.  However, he developed complications. Despite all efforts to save him, Golston died as a result of the injuries he sustained in the accident and the subsequent complications.

*Plaintiffs' Accident Reconstruction*

According to the plaintiffs' accident reconstruction expert, Seth Bayer, as Golston turned left the vehicle crossed the stop line for southbound traffic entering the intersection from Rosemary Road.  There was evidence of light braking, but no evidence of an emergency maneuver.  The vehicle rolled to the right one full 360-degree revolution, from its wheels to its wheels.

According to Bayer, the maximum speed the truck could have been traveling when it started the turn was 25 to 28 miles per hour for the friction marks to be made.  It could not have stayed within the documented path of travel if it made the turn at 35 miles per hour.  The vehicle was traveling between 20 and 23 miles per hour when its wheels came off the pavement and 19 miles per hour when it began to tip over.

Bayer testified the center of mass changes as the water truck travels because the water moves around.  It moves left and right as well as forward and back to some extent, although the baffle in the center of the tank limits the "fore and aft slosh somewhat."  The crosswise baffle does not mitigate the movement of water from left to right in turns.

7

Bayer opined the use of two vertical partitions on either side of the tank would limit not only the center of mass, but also the forces associated with the movement and would increase the stability of the vehicle. He presented a simulation using the same data from the accident reconstruction except with the use of longitudinal baffles. He determined the water would have moved less and with less velocity. In his opinion, the truck would not have rolled if baffles had been in place. The National Fire Protection Association standards refer to the use of such longitudinal baffles in fire trucks.

*Hooker Testimony and Exclusion*

Prior to trial, Hertz filed a motion in limine to exclude the testimony of plaintiffs' expert Robert Hooker. The court denied the motion without prejudice, but stated it would hold a hearing pursuant to Evidence Code[2] section 402 (402 hearing).

In the 402 hearing, Hooker explained he is an automotive consultant and a chief of police in a Michigan town. In his consultation work, he tests vehicles for safety compliance and handling. Although he is not an automotive engineer, he is a retired drag racer and has worked with professional engineers to perform vehicle testing. In addition, he has performed accident reconstruction work as a police officer. The court determined Hooker was qualified to provide opinions regarding handling and stability of a vehicle.

After hearing the foundation for Hooker's testimony, the court allowed Hooker to testify regarding stability and handling as well as the minimum national standards. The

---

[2]     All further statutory references are to the Evidence Code unless otherwise specified.

8

court concluded Hertz's objections to the foundation for his testimony went to weight rather than admissibility.

Hooker then testified before the jury. He stated manufacturers perform testing to understand or replicate the vehicle using different maneuvers. One such maneuver is a National Highway Traffic Safety Administration "J-turn" test, which inputs a specified degree of steering on the steering wheel once it reaches a target speed, then holds the steer while the gas pedal is released until "the vehicle scrubs off speed, and then it either follows the course or tips up." He understood the manufacturer of the cab and chassis involved in Golston's accident had performed a J-turn test of the cab and chassis, but without a water tank attached and without a liquid load.[3]

Hooker inspected the vehicle to determine its characteristics so he could obtain an exemplar for testing. He obtained an exemplar cab and chassis of the same year and model, along with a 2,000-gallon water tank from the same manufacturer that manufactured the subject Hertz truck. The exemplar vehicle was about 5,000 pounds lighter than the Hertz vehicle, but he stated this did not impact the testing. The only other difference was he used a vehicle with an automatic transmission rather than a manual transmission because he needed to instrument the exemplar vehicle to run unmanned tests by remote control.

Hooker performed a J-turn test because it puts the least amount of stress on the vehicle. Hooker explained he was not attempting to replicate the accident or Golston's

---

3    The cab manufacturer tested vehicles with a static load of bales and sandbags. Hooker testified this does not compare to testing with a liquid or "live" load.

maneuver. Instead, he was performing a standard industry test to evaluate the rollover performance of the vehicle in a controlled situation. He performed the test with the tank empty and with the tank full of water.

Hooker played a film clip of the J-turn testing with the tank empty showing the left rear wheels lift off the ground about three inches. The maximum speed the exemplar vehicle reached was 23.05 miles per hour. After an unreported side bar, the court precluded Hooker from showing the film clip of the testing with the tank full, which showed the truck rolling part way into the turn.

Hooker testified he saw no documentation by Hertz of an attempt to analyze or study the impact of the water load on the vehicle. In his opinion, the Hertz vehicle was defective in its design with the tank included. This opinion was based on tire friction, steering input and speed during a clearly foreseeable maneuver, i.e. a J-turn.

On cross-examination, Hooker admitted other factors such as brake application, radius of turn, tire friction and speed could influence a rollover even if a vehicle satisfied a J-turn test and he did not know whether these variables caused Golston's accident. He could not say the failure of the exemplar vehicle to complete the J-turn was the cause of Golston's accident.

After the conclusion of Hooker's testimony, Hertz moved to strike his testimony on the basis it had no probative value and was prejudicial because he did not establish a causal connection between the defect related to a J-turn test and the accident. Plaintiffs' counsel argued Hooker did industry testing of the vehicle to determine rollover propensity and his testing was probative in a products liability case regarding what a

manufacturer does or should do to evaluate such potential. The court struck Hooker's testimony and the film segment pursuant to section 352 stating the probative value of the evidence was "substantially outweighed by the likelihood that it will confuse and mislead the jury." The court instructed the jury not to consider the testimony of Hooker and the video in deliberation.

*Defense Experts*

Hertz presented testimony from Norris Hoover, a truck operations expert who taught truck driving courses. Hoover assumed Golston's truck was traveling at 35 miles per hour as he entered the turn. In his opinion, Golston was driving the water truck too fast for a 90-degree corner. He opined a safe speed to execute the turn would have been between 10 and 15 miles per hour. Hoover also opined Golston's employer did not properly train him for operation of the water tank truck.

The defense mechanical engineering expert, Geoffrey Germane, testified regarding his reconstruction of the accident. Germane opined the truck speed at the beginning of the turn was 33 to 38 miles per hour and decreased due to braking and sliding to approximately 21 to 24 miles per hour at the time it rolled over. Germane disagreed with Bayer's simulation and analysis regarding speed. He opined the simulation with an initial speed of 27 miles per hour would only rollover a quarter revolution and would fall short of the actual rest position of the truck by 30 feet.

Similarly, the defense reconstruction expert, Thomas Gillespie, testified Golston's truck was traveling about 35 miles per hour when the truck began to make tire marks on the turn. According to Gillespie, if the water was frozen in place or if baffles were

11

keeping the water from moving, the truck still would have rolled over. The truck was not capable of cornering at such a speed. Gillespie agreed the truck should turn at a speed no greater than 15 miles per hour. He also agreed there was no evidence Hertz made efforts to understand the impact of 2,000 gallons of water on the chassis.

*Verdict*

The jury determined, by a vote of 9 to 3, the water truck's design was not a substantial factor in causing harm to Golston. With respect to failure to warn, the jury unanimously determined (1) the water truck had potential risks that were "known or knowable" at the time of manufacture, distribution or rental and (2) the potential risks presented a "substantial danger to persons using or misusing the water truck in an intended or reasonably foreseeable way." However, it determined, by a vote of 10 to 2, ordinary users of a water truck would have recognized the potential risks.

DISCUSSION

I

*Jury Instructions*

A

*Standard of Review*

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced … which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) We independently review contentions the court erred in instructing the jury. (*Mansur v. Ford Motor Co.* (2011) 197 Cal.App.4th 1365, 1373.) In doing so, and in evaluating any prejudicial impact of

12

the allegedly erroneous instruction, we view the evidence in the light most favorable to the losing party because "we must assume the jury might have believed the evidence upon which the proposed instruction was predicated and might have rendered a verdict in favor of the losing party had a proper instruction been given." (*Bourgi v. West Covina Motors, Inc.* (2008) 166 Cal.App.4th 1649, 1664.)  When deciding whether an instructional error was prejudicial, we must consider "insofar as relevant, '(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations].' " (*Soule*, *supra*, 8 Cal.4th at p. 570-571.)

B

*Consumer Expectation Instruction*

"A manufacturer, distributor, or retailer is liable in tort if a defect in the . . . design of its product causes injury while the product is being used in a reasonably foreseeable way." (*Soule*, *supra*, 8 Cal.4th at p. 560.)  There are two alternative tests for design defect.  "First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 432 (*Barker*).)  "Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately

13

caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Ibid*.) "The jury should be instructed *solely* on the risk-benefit theory where, *as a matter of law,* the evidence would not support a jury verdict on the consumer expectation theory. (Haning, et al., Cal. Practice Guide: Personal Injury (The Rutter Group 2014) ¶ 2:1245, p. 2(II)-118.) In other words, a jury should be instructed on the risk-benefit theory of design defect alone *only* if the facts of the case do *not* permit "an inference that the product's performance did not meet the minimum safety expectations of its ordinary users." (*Soule*, at p. 568.)

In this case, plaintiffs do not contend it was inappropriate to give an instruction on the risk-benefit theory. Instead, they contend the court should have also given the alternative instruction regarding the ordinary consumer expectation test and the jury should have decided which test to apply. We agree.

"[T]he trial court must initially determine, as a question of foundation and in the context of the facts and circumstances of the particular case, whether the product is one about which the ordinary consumer can form reasonable minimum safety expectations. [Citation.] If the court concludes it is not, no consumer expectation instruction should be given. [Citation.] If, on the other hand, the trial court finds there is sufficient evidence to support a finding that the ordinary consumer can form reasonable minimum safety expectations, the court should instruct the jury, consistent with Evidence Code section 403, subdivision (c), to determine whether the consumer expectation test applies to the product at issue in the circumstances of the case and to disregard the evidence about

14

consumer expectations unless the jury finds that the test is applicable. If it finds the test applicable, the jury then must decide whether the product failed to perform as safely as an ordinary consumer would expect when the product is used in an intended or reasonably foreseeable manner." (*McCabe v. American Honda Motor Co.* (2002) 100 Cal.App.4th 1111, 1125, fn. 7 (*McCabe*).)

The consumer expectations test "involves the jurors' own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence." (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 126.) The question for the jury in determining if the consumer expectation test is applicable "is not whether the product, when considered in isolation, is beyond the ordinary knowledge of the consumer, but whether the product, *in the context of the facts and circumstances of its failure*, is one about which the ordinary consumers can form minimum safety expectations. [Citation.] If the facts permit such an inference, it is error to conclude the consumer expectation test is inapplicable as a matter of law." (*McCabe*, *supra*, 100 Cal.App.4th at p. 1124.)

Courts have found the consumer expectation test applicable in cases involving construction equipment and vehicle performance. (*Barker*, *supra*, 20 Cal.3d at p. 435 [design of high-lift loader may be evaluated under either consumer expectation or risk-benefit theory]; *Romine v. Johnson Controls, Inc.* (2014) 224 Cal.App.4th 990, 1004 [consumer expectation test appropriate for seat back failure in rear-end collision because "[c]onsumers have expectations about whether a vehicle's driver's seat will collapse rearward in a rear-end collision, regardless of the speed of the collision"]; *McCabe*,

15

*supra*, 100 Cal.App.4th at pp. 1123-1125 [error to conclude consumer expectation test inapplicable as a matter of law to air bag design where "there is sufficient evidence from which a jury could infer that the failure of an air bag to deploy under the facts and circumstances advanced by [plaintiff] violates commonly held minimum safety assumptions within the every day experience of ordinary consumers"]; *Akers v. Kelley Co.* (1985) 173 Cal.App.3d 633, 648-652, [consumer expectation test appropriate to evaluate adjustable dockboard which flew apart because an average juror "might reasonably think: 'Whatever the user may have expected from that contraption, it certainly wasn't that.' "], disapproved on other grounds in *People v. Nesler* (1997) 16 Cal.4th 561, 582, fn. 5.)

Here, the facts permitted an inference ordinary consumers could form minimum safety expectations of a water truck operating on a public highway. There was evidence someone who has learned to drive an ordinary vehicle can operate a water truck. Hertz permitted its customers to transport water on highways. Although some witnesses stated Golston was traveling 35 miles per hour, a witness close behind him saw him turn on his left turn indicator and slow down before executing the turn. Plaintiffs' reconstruction expert testified Golston's maximum speed was between 25 and 28 miles per hour when the water truck began to make tire marks on the road and the water truck was traveling at 19 miles per hour when it rolled over. Hertz's experts testified it was unsafe to negotiate a turn in the water truck at speeds in excess of 10 to 15 miles per hour. Based on everyday driving experiences, the jurors, as ordinary consumers, could have formed an opinion a truck rented for transporting water on highways should not roll over when

16

making a left turn at speeds between 19 and 28 miles per hour without warning. Therefore, the trial court erred in concluding the consumer expectation test was inapplicable as a matter of law. The jury should have been given an opportunity to decide the question.

The failure to give the consumer expectation instruction was prejudicial error. The first question on the verdict form was: "Was the water truck's design a substantial factor in causing harm to [Golston]?" The jury's response was a close call, answering "no" by a vote of 9 to 3. Had the jury been instructed on the consumer expectation test, it would have been asked to decide if the water truck "fail[ed] to perform as safely as an ordinary consumer would have expected when used or misused in an intended or reasonably foreseeable way." There is a reasonable probability the outcome may have been more favorable to the plaintiffs if the jury had been given the consumer expectation instruction and asked this question. No other instruction or argument of counsel mitigated the prejudicial impact. (*Soule*, *supra*, 8 Cal.4th at pp. 570-571; *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 655-656, 665 [nine-to-three and 10-to-2 verdicts "strongly suggest[] the instructional error was prejudicial."].)

C

*Sophisticated User Instruction*

Although manufacturers generally have a duty to warn consumers about hazards inherent in their products (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64), under the sophisticated user affirmative defense, "a manufacturer need not warn members of a trade or profession (sophisticated users) about dangers generally known to that trade

17

or profession." (*Id.* at p. 67.) "In order to establish the defense, a manufacturer must demonstrate that sophisticated users of the product know what the risks are, including the degree of danger involved (i.e., the severity of the potential injury), and how to use the product to reduce or avoid the risks, to the extent that information is known to the manufacturer." (*Buckner v. Milwaukee Electric Tool Corp.* (2013) 222 Cal.App.4th 522, 536.)

In this case, there was no substantial evidence to support the sophisticated user instruction. There was evidence anyone with a driver's license could operate a water truck. Although there was evidence Golston took some basic driving courses through Recon, these were in a passenger van, not a water truck. Hertz obtained testimony from John Perlas, Recon Regional Safety Director, who approved Golston for operation of a water truck on specific job sites and talked to Golston about the impact of water slosh in starting and stopping. However, Perlas testified Golston was not qualified to operate the vehicle on a highway and Perlas was not qualified to provide such training. There was some evidence someone with a valid license to drive should know to slow down when making a turn. However, there was no evidence it was generally known among water truck operators that a water truck could only safely turn at speeds of 10 to 15 miles per hour or that there was a likelihood a water truck would tip over at speeds between 19 and 30 miles per hour.[4]

---

[4] We do not consider the evidence submitted by Hertz regarding information about commercial driver licenses because the court excluded evidence of Golston's lack of a

Under these circumstances, we conclude there was no substantial evidence to support the sophisticated user instruction and giving the instruction was prejudicial. (*Pittman v. Boiven* (1967) 249 Cal.App.2d 207, 218.)  Hertz's counsel argued the sophisticated user defense to the jury advising them it was a complete defense to the failure to warn claim.  The jury sent a note during deliberation asking to define the term "potential risk" in connection with the failure to warn questions.  Although the jury unanimously found the water truck had potential risks that were known or knowable and those risks posed a substantial danger to persons using or misusing the truck in an intended or reasonably foreseeable way, it found by a vote of 10 to 2 that ordinary users of water trucks should have recognized the potential risk.  This close verdict indicates the jury likely "factored in" the sophisticated user instruction in their deliberation.  Therefore, we cannot say the error was harmless.

II

*Striking of Hooker's Testimony*

Plaintiffs also contend the court abused its discretion in striking the entirety of Hooker's testimony after he testified.  We agree.

The trial court struck Hooker's testimony pursuant to section 352, on the basis that it was more prejudicial than probative.  Trial courts generally have broad discretion under section 352 to weigh the probative value of the evidence against the prejudicial impact. "Appellate courts will not disturb this determination on appeal unless one factor clearly

_____

commercial driver's license and evidence regarding the commercial driver's license handbook was never admitted or considered by the jury.

19

outweighs the other."  (*Akers v. Miller* (1998) 68 Cal.App.4th 1143, 1147.)  "The discretion granted to courts by section 352 is not absolute or unlimited but requires that the trial judge balance the probative value of the proffered evidence against its prejudicial effect in the context of the case before the court."  (*Burke v. Almaden Vineyards, Inc.* (1978) 86 Cal.App.3d 768, 774.)  "The more substantial the probative value the greater must be the prejudice in order to justify exclusion.  Among factors which should be considered are its materiality; the strength of its relationship to the issue upon which it is offered; whether it goes to a main issue or merely to a collateral one; and, whether it is necessary to prove proponent's case or merely cumulative to other available and sufficient proof."  (*Ibid.*)

In this case, there was evidence Hertz ordered water trucks to be fitted with water tanks to rent to construction companies, such as Recon.  However, Hertz did not test the performance of this vehicle with the water tank attached.  Hooker testified regarding his use of an industry standard performance test, the J-turn test, which was performed by the manufacturer of the cab and chassis without the water tank attached.  In his opinion, when the water truck was fitted with the tank, it failed to perform in accordance with industry standards.  Hooker showed the jury a video clip depicting an *empty* water truck performing a standard J-turn test with its wheels lifting off the ground at approximately 23 miles per hour.  The court excluded the video clip showing a full water truck rolling three-quarters of a revolution during the J-turn test.  This testimony was significant for the plaintiffs' case regarding design defect, under either a consumer expectation theory or a risk-benefit theory, and failure to warn.  Based on this evidence, plaintiffs would have

20

argued an ordinary consumer should expect a water tank truck should meet minimum performance standards for rollover or carry a warning. Additionally, Hooker's testimony was probative under the risk-benefit theory to demonstrate Hertz did not undertake the appropriate analysis of its product.

Hooker's testimony was not prejudicial or likely to confuse or mislead the jury. " ' "Prejudice" as contemplated by … section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption " 'substantially outweigh' " the probative value of relevant evidence, a section 352 objection should fail.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439.)

Unlike the case in *Holling v. Chandler* (1966) 241 Cal.App.2d 19, 22-24, Hooker made it clear in his testimony he did not attempt to reconstruct the accident, but was testifying regarding industry performance standards, which were relevant to the issue of product liability. Additionally, although he was not asked to opine about causation of the accident, other evidence was presented from which a jury could have made the causal connection. Under these circumstances, we conclude Hooker's testimony was not more prejudicial than probative and the trial court abused its discretion in striking his testimony and the video presentation.

On the other hand, the erroneous exclusion of Hooker's testimony after it was already presented to the jury was prejudicial to the plaintiffs.  Had the jury been allowed to consider his testimony and the video clips of his testing, it is reasonably probable plaintiffs would have obtained a more favorable result.  (*Cassim v. Allstate Ins., Co.* (2004) 33 Cal.4th 780, 800-802.)

## DISPOSITION

The judgment is reversed.  Plaintiffs shall recover their costs on appeal.

McCONNELL, P. J.

WE CONCUR:

BENKE, J.

NARES, J.

22